943 P.2d 782

**MONTHOFER INVESTMENTS LIMITED PARTNERSHIP, an Arizona limited partnership; The E.M.W. Family Trust; Wolfgang Monthofer and Nancy J. Monthofer, husband and wife, Third–Party Plaintiffs/ Appellants,**

v.

**Mark R. ALLEN and Jane Doe Allen, husband and wife; Mark R. Allen, P.C., an Arizona professional corporation, Third–Party Defendants/ Appellees.**

No. 1 CA–CV 93–0366.

Court of Appeals of Arizona,
Division 1, Department C.

Jan. 28, 1997.

Review Denied Sept. 16, 1997.

Reconsideration Denied Nov. 14, 1997.

Hebert, Schenk, Johnsen & Dake, P.C. by Joseph A. Schenk, Phoenix, for Third–Party Plaintiffs/Appellants.

Turley & Swan, P.C. by Elizabeth Savoini Fitch and Christopher J. Bork, Phoenix, for Third–Party Defendants/Appellees.

Beus, Gilbert & Morrill, P.L.L.C. by Martin A. Aronson and Joseph M. Leal, III, Phoenix, for Amicus Curiae Standard Chartered P.L.C.

Snell & Wilmer by John J. Bouma, Daniel J. McAuliffe and Martha E. Gibbs, Phoenix, for Amicus Curiae Fennemore Craig, P.C.

### OPINION

FIDEL, Judge.

In 1987, Wolfgang and Nancy Monthofer were co-trustees of the E.M.W. Family Trust, an entity which served as the sole general partner of another entity known as Monthofer Investments Limited Partnership ("MILP"). Mark Allen was the Monthofers' attorney.

In August 1987, as part of a complex real estate transaction, Allen arranged for MILP to assume liability on a full-recourse promissory note ("the Note") held by Goodbuck Investors Limited Partnership Number 3 ("Goodbuck"). In preparing the necessary documents, however, Allen mistakenly identified the Monthofers as general partners of MILP, when he should have identified E.M.W. Family Trust as the true general partner and the Monthofers as merely co-trustees of E.M.W. Family Trust. By signing as general partners, the Monthofers assumed personal liability on the Note.

MILP made the first annual payment on the Note in April 1988, but failed to make the payment due in April 1989. Goodbuck sued the Monthofers, alleging default. The Monthofers then filed a combined answer and third-party complaint against Allen, alleging that their personal liability, if any, arose from Allen's negligence in identifying them on the Note as general partners of MILP.

The parties to the Goodbuck–Monthofer lawsuit eventually entered a settlement agreement that called for a stipulated judgment to be entered against the Monthofers "in an amount equal to the total amount due and owing under the Note, including ... interest, late charges, litigation costs, and attorneys' fees." In exchange for Goodbuck's agreement not "to record, collect, or execute upon the stipulated judgment," the Monthofers promised to pursue their third-party claim against Allen and to assign any proceeds to Goodbuck to the extent necessary to satisfy the stipulated judgment.

The Monthofer–Allen claim proceeded to trial in April 1993. At the close of the Monthofers' case-in-chief, Allen moved for a directed verdict, asserting that the Monthofers' non-execution agreement with Goodbuck eliminated any damages from Allen's alleged malpractice. The trial court agreed that the non-execution agreement eliminated the face

amount of the Goodbuck–Monthofer stipulated judgment as an element of damages, and directed a verdict for Allen on that issue. But the court permitted the Monthofers to proceed against Allen for the attorneys' fees they had incurred during the Goodbuck–Monthofer suit and for any damage to their credit rating from the Goodbuck–Monthofer stipulated judgment.

After a jury found for Allen on the surviving claims, the Monthofers appealed, raising three issues: (1) whether the trial court committed reversible error by eliminating the face amount of the Goodbuck–Monthofer judgment as an element of their damages; (2) whether the trial court erred by admitting the Goodbuck–Monthofer settlement agreement into evidence; and (3) whether the trial court incorrectly instructed the jury on the law of attorney malpractice. We address each issue in turn.

## I. THE NON–EXECUTION AGREEMENT AND DAMAGES

■ We first consider whether the trial court erred in granting Allen a partial directed verdict striking the face amount of the Goodbuck–Monthofer judgment as an element of the Monthofers' damage claim against Allen.

Damages are a necessary element in a legal malpractice action, as in any negligence action. *Phillips v. Clancy*, 152 Ariz. 415, 418, 733 P.2d 300, 303 (App.1986). Further, damages must be "ascertainable and nonspeculative." *Tullar v. Walter L. Henderson, P.C.*, 168 Ariz. 577, 579, 816 P.2d 234, 236 (App.1991). Thus, the directed verdict was proper if either: (1) the non-execution agreement eliminated any damages to the Monthofers from the Goodbuck–Monthofer judgment; or (2) the non-execution agreement made the Monthofers' damages unascertainable or speculative.

In this case, these questions are essentially the same. Given the face amount of the judgment, there is nothing speculative or unascertainable about the amount of damages, if any, attributable to the judgment. The question is whether the judgment, although certain in amount, constitutes a damage element at all in light of the non-execution agreement.

### A. The Judgment Rule

To support their position that the non-execution agreement did not eliminate the Goodbuck–Monthofer stipulated judgment as a damage item against Allen, the Monthofers argue that Arizona courts should follow the "judgment rule." The judgment rule treats the full face amount of a judgment as a loss to the judgment debtor even if the debtor has made no payments on the judgment. *See, e.g., Roebuck v. Steuart*, 76 Md.App. 298, 544 A.2d 808, 814 (1988).

Allen does not dispute that Arizona courts should follow the judgment rule. However, each of the judgment rule cases cited by the Monthofers was grounded in a judicial concern, absent in this case, that a plaintiff/judgment debtor faced the imminent threat of execution on the underlying judgment. *See Roebuck*, 544 A.2d at 814; *Carter v. Pioneer Mut. Casualty Co.*, 67 Ohio St.2d 146, 423 N.E.2d 188, 191 (1981); *Montfort v. Jeter*, 567 S.W.2d 498, 499–500 (Tex.1978); *Hernandez v. Great American Ins. Co.*, 464 S.W.2d 91, 94 (Tex.1971); *Allied Prods., Inc. v. Duesterdick*, 217 Va. 763, 232 S.E.2d 774, 777 (1977) (Poff, J., dissenting). None of these cases concerned a covenant not to execute.[1] Moreover, because even recordation of the Goodbuck–Monthofer judgment is precluded by the non-execution agreement, the Monthofers do not face credit damage comparable to that faced by the plaintiffs in the judgment rule cases. Thus, the judgment rule cases do not help us to decide this case.

### B. Mitigation and the "Damron" Cases

Allen argues that the non-execution agreement constitutes a total mitigation by the Monthofers of any damages they might oth-

---

1. Though none of the cases cited by the Monthofers concerned covenants not to execute, we note that other jurisdictions have applied the judgment rule to legal malpractice cases involving such covenants. *See, e.g., Jacobsen v. Haugen*, 529 N.W.2d 882, 884 (N.D.1995); *Ammon v. McCloskey*, 440 Pa.Super. 251, 655 A.2d 549, 553 (1995).

erwise have suffered from the Goodbuck–Monthofer judgment, eliminating the judgment as a damage element against Allen.

We distinguish for the purpose of this discussion between two related issues: (1) Does the non-execution agreement constitute a mitigation of damages inuring to the benefit of Allen? (2) If not, is the jury entitled to consider the non-execution agreement as evidence that the Monthofers too readily capitulated to a judgment and failed to meet their obligation to Allen to mitigate their damages? We defer the second question to Part II of this decision. To answer the first question, we distinguish a covenant not to execute from a release.

If, as a result of the Goodbuck–Monthofer negotiations, Goodbuck had released the Monthofers from any liability on the Note, the Monthofers would have avoided the substantial consequences of Allen's alleged malpractice, and Allen would face liability to the Monthofers only for incidental costs associated with the Goodbuck–Monthofer suit. *See* 66 AM.JUR.2D *Release* § 1, at 678 (1964) ("A release is the giving up or abandoning of a claim or right to the person against whom the claim exists or the right is to be enforced or exercised."); *see also Kay v. Bricker*, 485 So.2d 486, 487 (Fla.App.1986) (a lawyer's liability for negligently exposing a client to damages to another or negligently impairing a client's claim against another is offset by the amount of any damage reduction the client achieves through negotiated settlement with the other); *McLane v. Russell*, 159 Ill.App.3d 429, 111 Ill.Dec. 250, 254–55 512 N.E.2d 366, 370–71 (1987) (same), *aff'd*, 131 Ill.2d 509, 137 Ill.Dec. 554, 546 N.E.2d 499 (1989); *Katzenberger v. Bryan*, 206 Va. 78, 141 S.E.2d 671, 676–77 (1965) (same); *Gustavson v. O'Brien*, 87 Wis.2d 193, 274 N.W.2d 627, 631–32 (1979) (same).

However, the Monthofers did not obtain a release from Goodbuck; nor did they achieve by settlement any reduction in the note amount. To the contrary, Goodbuck obtained a personal judgment against the Monthofers for the full amount due under the Note in exchange for Goodbuck's contractual promise not to execute. The Monthofers claim, by reference to numerous "*Damron* agreement" cases, that such a promise does not mitigate, vitiate, or eliminate in any respect the damages flowing from the judgment. *See generally Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969); *see also United Serv. Auto. Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987); *State Farm Mut. Auto. Ins. Co. v. Paynter*, 122 Ariz. 198, 593 P.2d 948 (App.1979); *Globe Indem. Co. v. Blomfield*, 115 Ariz. 5, 562 P.2d 1372 (App.1977); *Kagele v. Aetna Life & Casualty Co.*, 40 Wash.App. 194, 698 P.2d 90 (1985).

In a typical *Damron* agreement, an insured transfers his indemnity claims against his insurer to a judgment creditor in exchange for the judgment creditor's covenant not to execute against the insured. *See, e.g., Damron*, 105 Ariz. at 152–53, 460 P.2d at 998–99. And in *Damron* agreement cases, both divisions of this court have rejected the assertion that a covenant not to execute nullifies the judgment as a recoverable element of damages:

> A covenant not to execute is merely a contract and not a release.... It seems reasonable to conclude, therefore, that the insured's tort liability remains but that he has an action for breach of contract if the [judgment creditor] attempts to collect the judgment in violation of the covenant.

*Blomfield*, 115 Ariz. at 8, 562 P.2d at 1375 (citations omitted); *accord Paynter*, 122 Ariz. at 203, 593 P.2d at 953; *Kagele*, 698 P.2d at 93. If the *Blomfield/Paynter* analysis of covenants not to execute applies beyond the insurance context of those cases, it disposes of Allen's mitigation argument in this case.

Allen argues, however, that the *Blomfield/Paynter* conclusion that damages survive a non-execution agreement is merely a legal fiction indulged as a matter of policy to protect the public from insurers who "deliberately breach specific contractual duties" to their insureds. Arguing that no policy justification supports such a fiction in the current context, he argues that the *Damron* cases are inapposite to this case.

Our reading of those cases does not support Allen's effort to confine them. First, neither *Blomfield* nor any of the other *Damron* cases mentions or purports to indulge a

legal fiction. Second, our courts have held, in contexts other than disputes between insurers and insureds, that covenants not to sue or not to execute are contracts, not releases. *See, e.g., Hovatter v. Shell Oil Co.,* 111 Ariz. 325, 326–27, 529 P.2d 224, 225–26 (1974) (covenant not to sue alleged servant does not negate his liability so as to release alleged master); *Fagerberg v. Phoenix Flour Mills Co.,* 50 Ariz. 227, 233–36, 71 P.2d 1022, 1025–26 (1937) (covenant not to sue one joint tortfeasor does not constitute a release, which otherwise would operate as a release of all joint tortfeasors). Third, Allen has not cited—and we have not found—any authority for a general rule that a non-execution agreement precludes consideration of a judgment as an element of damages in a separate negligence suit.

Allen next attempts to differentiate *Blomfield* and other *Damron* cases as claims pursued in the assignee's name, eliminating any risk that the jury might be misled. In this case, by contrast, Goodbuck did not carry the claim forward; the Monthofers continued to pursue it in their own name. We acknowledge this distinction, but do not find it a persuasive basis for treating the covenant not to execute as extinguishing damages in this case. Rather, we find it an aspect of the parties' alignment that warrants trial court

vigilance in the conduct of the trial. *Cf. Sequoia Mfg. Co. v. Halec Constr. Co.,* 117 Ariz. 11, 24, 570 P.2d 782, 795 (App.1977) (requiring trial court vigilance in conducting trials involving Gallagher [2] agreements). The facts and circumstances of the Goodbuck–Monthofer settlement agreement have been disclosed to Allen and to the trial court, and the trial court will have discretion, on remand, to disclose them to the jury if it deems disclosure necessary to prevent the jury from being misled. *See* Part II *infra.*

## C. The Abandoned Issue of Assignability

Allen seeks in passing to distinguish the *Damron* line of cases on the ground that a legal malpractice claim is unassignable, unlike an insured's bad faith claim against his insurer. In the single paragraph that Allen devotes to this argument, however, he does not explain how one can reason from the premise that the Monthofers attempted an unenforceable assignment of their claim to the conclusion that the Monthofers thereby extinguished their supposedly unassignable claim.[3] Further, Allen conceded at oral argument that the issue of assignability was abandoned in the trial court and not preserved for this appeal.[4]

---

2. *See generally City of Tucson v. Gallagher,* 108 Ariz. 140, 493 P.2d 1197 (1972).

3. It is one thing to assert that an invalidly assigned claim is an unassigned claim in the eyes of the law and that the assignee cannot pursue the action against a third party or require performance by a reluctant assignor. *See Schroeder v. Hudgins,* 142 Ariz. 395, 399, 690 P.2d 114, 118 (App.1984); *Karp v. Speizer,* 132 Ariz. 599, 600–01, 647 P.2d 1197, 1198–99 (App.1982). It is another thing to assert that the assignor forfeits the claim by attempting to assign it.

4. Early in the lawsuit, Allen indeed asserted that the Goodbuck–Monthofer settlement agreement was an invalid assignment of a legal malpractice claim; he moved to dismiss the Monthofer–Allen lawsuit on that ground. The trial court denied the motion, however, ruling that (1) the agreement was not an assignment but a security agreement, and (2) even if the agreement had aspects of an assignment, such aspects were severable pursuant to an express severability clause.

Allen did nothing thereafter to challenge the trial court's characterization of the agreement as something other than an assignment; nor did he attempt thereafter, at the trial court or on ap-

peal, to revive his assertion that the agreement, as an assignment, was invalid. In the pretrial statement, Allen did not identify the validity of the Monthofer–Goodbuck agreement as an issue that he continued to contest. Instead, he attempted to make affirmative use of the agreement, listing it as an exhibit tending to establish that the Monthofers, by capitulating to Goodbuck, had abandoned viable defenses and failed to appropriately mitigate their damages. Similarly, when Allen defended the admissibility of the agreement in response to the Monthofers' motion to exclude it, Allen did not renew the argument that the agreement was invalid. Rather, he argued that it was admissible to establish the Monthofers' failure to mitigate damages and to demonstrate the bias of the Monthofers and of witness John Lancy, a Goodbuck principal.

Allen similarly chose not to contest the validity of the agreement when he moved for directed verdict at the close of the Monthofers' evidence. Nor did the court revisit that subject in ruling on that motion. The motion for directed verdict was confined entirely to the question whether, in light of the covenant not to execute embodied in the agreement, the Monthofers had proven any submissible damages.

We are nonetheless asked by amici curiae to resolve the question whether the Monthofer–Goodbuck agreement constituted an invalid assignment.[5] We decline to address an abandoned issue in this case to assist amici in the resolution of an independent case. Instead, we confine ourselves to the issues that have been preserved.

### D. Holding and Consideration of Harmless Error

We have cited *Blomfield* and *Paynter* for the proposition that damages survive a non-execution agreement. Finding no basis to distinguish those cases, we hold that the non-execution agreement gave the Monthofers a contractual right against Goodbuck, but did not mitigate or eliminate the damages associated with the Goodbuck–Monthofer judgment. There was, accordingly, no basis for the trial court's directed verdict striking that judgment as a damage element in the Monthofer–Allen negligence claim.

■ Allen asserts, however, that the directed verdict, if erroneous, was harmless error. Allen argues that, because the jury rejected the Monthofers' other damage claims, the jury must have determined that Allen was not liable for *any* damages. We cannot agree. The trial court instructed the jury, "Before you can find [Allen] at fault, you must find that [Allen's] negligence was a cause of injury to the Monthofers." The court also instructed:

> The Court has determined as a matter of law that the Monthofers have not suffered any actual damages from the stipulated judgment because of the Covenant not to Execute. You shall not award any damages for the amount of the stipulated judgement [sic]. You may however, consider the stipulated judgment and Covenant not to Execute in determining whether the Monthofers have suffered any actual

damages that flow from the entry of judgment.

> If you find Mark Allen liable to the Monthofers, you must then decide the full amount of money that will reasonably and fairly compensate for each of the following elements of damages proved by the Monthofers' evidence to have resulted from the fault of Mark Allen:
>
> (1) Reasonable and necessary attorneys fees incurred by the Monthofers in defending the Goodbuck lawsuit; and
>
> (2) Any damage to the Monthofers' credit resulting from the stipulated judgment and covenant not to execute.

The court also instructed the jury that it was "not permitted to award speculative damages."

There was ample room within these instructions for the jury to have found Allen at fault but to have returned a defense verdict because it found the Monthofers' evidence regarding attorneys' fees and credit damage inadequate to support a damage award. Because the outcome might have been different if the trial court had permitted the jury to consider the Goodbuck–Monthofer judgment as an element of damages, we cannot find that the directed verdict was harmless error. We must therefore reverse and remand for a new trial.

## II. ADMISSIBILITY OF THE SETTLEMENT AGREEMENT

The Monthofers also argue that the trial court improperly admitted the Goodbuck–Monthofer settlement agreement into evidence. We discuss this question because it is likely to recur on remand.

Though we have held that the non-execution agreement does not eliminate the judgment as an element of damages, we do not hold that the agreement is inadmissible. The details of the settlement agreement are

---

In short, the issue of the validity of the agreement vanished one and a half years before trial when the trial court characterized it as something other than an assignment and denied Allen's motion to dismiss. Allen never revived the issue in the trial court and did not assert on appeal that the trial court's ruling was wrong.

5. Fennemore Craig, P.C., as amicus curiae, argues the invalidity of the agreement. Standard Chartered PLC, in a responding amicus brief, argues in favor of its validity. Amici are adversaries in separate, unrelated litigation, and it would guide the resolution of their separate case if we chose to resolve the question of assignability in this one.

potentially probative in two respects. First, they are potentially probative of the bias of certain witnesses. Second, they are potentially probative on the question whether the Monthofers failed to take reasonable measures to mitigate their damages (*e.g.*, by withholding valid defenses and precipitously agreeing to entry of an avoidable judgment for the full amount owing under the Note). A person injured by another's negligence cannot recover for losses due to "avoidable consequences." William L. Prosser and W. Page Keeton, THE LAW OF TORTS, § 65, at page 458 (5th ed. 1984) (cited with approval in *Law v. Superior Court*, 157 Ariz. 142, 145–46, 755 P.2d 1130, 1133–34 (App.1986), *approved in part*, 157 Ariz. 147, 755 P.2d 1135 (1988)).

We do not hold that the potentially probative value of the agreement *requires* its admission upon remand. Whether the probative value of evidence is "substantially outweighed by the danger of unfair prejudice" is a matter left to the sound discretion of the trial court. Ariz. R. Evid. 403; *see also Readenour v. Marion Power Shovel*, 149 Ariz. 442, 449–50, 719 P.2d 1058, 1065–66 (1986). We so leave this matter in this case, depending on the trial court to determine to what extent and for what purposes the details of the settlement agreement are admissible when this case returns to trial. *Cf. Sequoia Mfg.*, 117 Ariz. at 24, 570 P.2d at 795 ("the trial court is in unique position to view the factors surrounding such an agreement [there, a Gallagher agreement]" and to decide admissibility "[a]fter observing the conduct of all counsel, their demeanor, their witnesses, and the overall atmosphere of the courtroom.").

### III. THE MALPRACTICE INSTRUCTION

The Monthofers finally argue that the jury was instructed improperly on the law of attorney malpractice. They object to the following jury instruction:

No lawyer is bound to know all the law. It is not an exact science. There is no attainable degree of skill or excellence at which all differences of opinions or doubts upon questions of law can be removed from the minds of lawyers and judges. If the law on a subject is well established and clearly defined and has existed and been published long enough to justify that it was known to the profession, a lawyer who disregards the rule or is ignorant of it renders himself liable for losses caused by such negligence or want of skill. However, where the area of law is not well-settled and clearly defined, a lawyer is not liable for an error in judgment if he acts in good faith and an honest belief that his advice and acts are well-founded and in the best interests of his clients.

Our supreme court has cautioned against instructions which "might cause jurors to view the evidence 'in accordance with what they believe to be the court's judgment as to its weight rather than their own.'" *Rosen v. Knaub*, 175 Ariz. 329, 331, 857 P.2d 381, 383 (1993) (citation omitted). A jury instruction should not give undue prominence to either party's theory of the case, but rather should tell the jury "in neutral terms of the legal rules to be applied." *Id.*; *see also AMERCO v. Shoen, M.D.*, 184 Ariz. 150, 154, 907 P.2d 536, 540 (App.1995). The lengthy and discursive instruction given by the trial court pays insufficient heed, in our opinion, to the *Rosen* proscription.

Further, at least one court has rejected similar language as inconsistent with the law of negligence. *See Cosgrove v. Grimes*, 774 S.W.2d 662, 664–65 (Tex.1989). Neither party has cited authority to establish whether the instruction correctly states Arizona law. We do not reach that issue, however, because a preliminary question may render the issue moot.

Assuming, without deciding, that the core of the challenged instruction is consistent with Arizona law, an instruction along similar lines would be appropriate only if there were evidence to support its underlying theory. *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982). Unless there is evidence to support the theory that Allen's misidentification of the Monthofers as general partners of MILP constituted an "error in judgment" in an "area of law [that] is not well-settled and clearly de-

fined," no instruction along these lines is proper.

No evidence that would support such an instruction appears in the record before us. However, as Appellee points out, our record is incomplete and does not include the testimony of the parties' legal experts. Accordingly, we underscore this issue for the trial court upon remand and do not attempt to resolve it at this stage.

## IV. CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court and remand this case for proceedings consistent with this decision.

GARBARINO, P.J., and EHRLICH, J., concur.